v. Judges of the U.S. Court of Appeals for the Fourth Circuit This case involves challenges to an Executive Order and the State Department's Implementing Funding Notice. The Order, which can be found at JA 47, directs the Secretary of State to develop a process by which state and local government consent to resettlement of refugees is taken into account to the maximum extent consistent with law. The Notice, which can be found at JA 51, implements that directive by asking resettlement agencies to gather consent for jurisdictions where they propose to resettle refugees. Nothing in the Order or the Notice supplants the State Department's ultimate discretion to determine where in the country refugees shall be resettled. Consequently, this Court should vacate the District Court's preliminary injunction because contrary to the District Court's conclusion, the consent requirement described in the Executive Order and implemented by the Funding Notice does not give states or localities a veto over refugee resettlement in their borders. Now, plaintiffs focus most of their arguments on the Notice, but I'd like to start with the Executive Order. Consistent with the Refugee Act, the Executive Order expresses the federal government's policy that the views of state and local governments are an important factor in deciding where to resettle refugees, and so it directs the Secretary of State to create a mechanism for taking those views into account. There's nothing inherently unlawful in that directive. So, excuse me, this is Judge Harris. I don't understand that. There was already a system in place to take those views into account, and I'm just looking at the Executive Order. It doesn't say that the policy is that the views should be taken into account. It says that the policy is that refugees should be resettled only in those jurisdictions in which both state and local governments have consented. So, explain to me if this is just about making sure that views are taken into account, why it was necessary that you went into it. Certainly, Your Honor. So, a couple of responses to that. And first, I think I direct Your Honor's attention to JA-47 under Section 1, Purpose, which describes how some states and localities have viewed the existing consultation requirement that exists in Section 1522 of the Refugee Act. But then the opposite of Section is Section 2, and the title is Consent of States and Localities to the Placement of Refugees. So, it's just hard for me to understand. Is your argument really that this Executive Order is not about getting consent before there's resettlement? Oh, Your Honor, we think absolutely the Executive Order addresses the fact that written consents should be gathered from states and localities. Absolutely. But, again, going back just for a moment to that. Is it your position that consent and consultation are the same thing? Your Honor, we think that a consent requirement is a very clear way to obtain states and localities' views. So, and that is something that would happen during consultation, but it's a way to clearly communicate whether the state or locality is able to accept refugees. Is it the government's position that consult and consent mean the very same thing? I think as a matter of practicality, Your Honor, yes. And I think if we think, let me give you an example of why that sort of makes sense. You know, this Court's local rules and many courts' local rules require attorneys to seek the consent of opposing counsel before they file particular motions or request particular relief from the court. And, of course, that doesn't set up some type of veto over the Court's ultimate decision on that motion. And likewise here, I think that's exactly what's going on with this consent requirement. It's not a, you know, yes, refugees get to be resettled here if we consent, or no, they can't be put here if we don't give consent. It's instead just a means of clearly communicating the state and local government's views. Now, of course, in consultation, you know, conversations are broader than a mere yes-no on refugee resettlement. But as far as this requirement goes, it's not setting up a hard and fast veto over the federal government's ultimate placement decision. And so to go back to Judge Harris' question for a moment, you know, under Section 1, the purpose of this executive order makes clear that there's a need for, quote, a more clearly defined role for state and local governments. And this is exactly the sort of clear mechanism that would provide that. Ms. Mundell, this is Judge Keenan. Will the federal government then engage in consultation aside from the consent requirement? Absolutely, Your Honor. That is the entire, you know, Section 1522 discusses all of that consultation. So you're saying this is simply an add-on then? It's a clear mechanism to sort of have these conversations at a very early point in the process. Let me ask you a question. Something that's been really bothering me about this, and I guess it maybe reflects my background in state and local government law, but the executive order sets up a construct that is clearly unworkable in the context that a locality can withhold consent if a state consents. The locality in most states is nothing more than a political subdivision of the state. The locality can't withhold consent. And yet this order permits this. How do you reconcile the – it seems to me that the chaotic construct you have here, where you're putting the localities and the states at odds with their state constitutions. Well, Your Honor, I think it's important to sort of recognize the practicalities on the ground here, and I think we only have perhaps a chaotic system if this court agrees with the district court that a mere consent or non-consent sets up this sort of veto power where no refugees get to go. And that's not how this operates. And so if a locality were to submit a letter to the State Department saying, you know, we don't think we can accommodate refugees this year, and so we can't give our consent, but the state itself broadly says we welcome refugees in any of our locations, wherever folks would like to be. Again, this is important information that the State Department might consider among many factors. Right. Although the localities act is a nullity under state law. Under the law of most states, the locality's statement that they do not consent in opposition to the state's statement that they do consent is a nullity. A locality is not authorized to act in contravention of the state because it's merely a political subdivision of the state and gets only its powers only derived from the state. So why doesn't that create a chaotic situation in implementation? Well, and Your Honor, and I agree with you that, you know, states and localities have to have sort of this respective government. But at the end of the day, when a locality provides its consent, the locality is not providing some type of legal authorization for refugees to go there. It's merely a way to communicate to the State Department that they are willing or unwilling to accept refugees. And then it's up to the State Department, in its discretion, to consider that information in concert with all the other factors. And the fact that a locality may have a different view... Wait, wait, wait. Counsel, this is Judge Harris. I don't see where you get that. Are you saying that under the executive order, if consent is denied, that is merely something that should be considered with all the other factors? And if so, where do you get that? Absolutely, Your Honor. And this sort of gets back to a point that I would have liked to make to your earlier question, which is looking at Section 2B on JA-48. You know, that section expressly acknowledges that the State Department can resettle refugees in non-consenting states. Only if it can make a finding that failing to resettle the refugees within a particular locality would be inconsistent with the criteria established under law. Can you tell me what that even means? Let me just give you an example. Say Atlanta doesn't give its consent, even though Georgia did. So now we have this chaotic situation. Under the statute, you look at factors like, well, does Atlanta have the resources? Is there too much out-migration? What would it mean to say that failing to resettle a refugee in Atlanta would somehow be inconsistent with those statutory criteria? That's like a double negative that I don't understand. Certainly. So I think in that example, Your Honor, you know, if Atlanta says we can't accommodate refugees this year, the Secretary of State takes that information and it looks also at the other factors Your Honor highlighted, which, by the way, you know, in case the Court would like to follow along, the statute is reproduced at A-1 of our addendum to our opening brief. And in that section, that little 3, subsection C-3, it instructs the State Department to consider those other factors, employment opportunities, housing. And so all of those go into a bucket of, you know, of information. But that's not what it says. The executive order doesn't say the State Department can resettle there, resettle a person there, notwithstanding the lack of consent, so long as that would be consistent with those factors. It has to be, someone has to be able to say if I put in anywhere but Atlanta, that would be inconsistent with the statutory scheme. How will that ever be the case? I just literally don't understand how this exception could ever be satisfied. It would have to be right that there is literally nowhere else in the country where you could put this refugee? Well, Your Honor, it wouldn't satisfy the exception as it is written to show that it would be consistent with the statute to put a refugee in Atlanta. It has to be inconsistent with the statute not to put him in Atlanta. And please explain to me the scenario where that would be true. Well, that's right, Your Honor. And I think, again, you know, this is a question, by the way, that occurs much later down the line in the process. This is a genuine question. Is there a scenario that you guys have in mind that would trigger this exception? Well, Your Honor, I think, you know, for example, if a particular refugee has a very strong community, you know, family members or otherwise that are located in Atlanta, and Atlanta has plenty of resources to care for that refugee and, you know, set them up to be that refugee. But how would it be inconsistent with the statute? There's nothing in the statute that says you have to go where you have friends or ties. If you can find some other city that has resources, it wouldn't be inconsistent with the statute to relocate the person there. Well, Your Honor, I think. It might be more consistent to put them in Atlanta, but that's not what the exception says. Well, another factor that's listed in the Refugee Act in that subsection is secondary migration, which, of course, could occur if the refugee is moving from one place where they have no family to Atlanta where they do have family. And so, you know, I realize that there might be questions on the ground about once the Secretary of State gets all of this information, what the Secretary does with it. But as far as what the order requires, the order just requires the Secretary to develop a mechanism to get those consents. Okay. But, Ms. Mundell, what we have in the order is, it seems to me, totally reading out the relocation agencies. There is absolutely no mechanism that if an agency wants to override the consent issue, how do they apply? There's absolutely no structure, no procedure. The Secretary of State issues this notice that doesn't address the procedure for applying the savings clause. So even if you have a valid savings clause, there's absolutely nothing in this that directs the resettlement agencies in how to go about it. It seems to me that this is like a one-off. This is like somebody's idea of something good to do without any thought as to how it's going to be implemented. And how can it be consistent with the Refugee Act when there is no provision for how the savings clause can be implemented, if, in fact, it is a savings clause? Sure. So two responses to that, Your Honor. One, I think you're correct to sort of separate the executive order from the notice on this part. So when we think about that savings clause in the order and thinking about how the notice implements it, I think it's important to keep those separate. But second, you're correct also that the notice does not specifically say that when a state or a locality refuses to give consent, that these resettlement agencies can't apply. And, in fact, I can tell you, on behalf of the State Department, that they will not reject an application merely because an agency has applied for a location that has refused to give consent. There's nothing in the notice that says they will reject that application. And, in fact, practically speaking, they won't. Well, the notice is suggesting, excuse me, Ms. Mundell, Judge Keenan again, the notice is suggesting like there's a provision for a rolling consent type thing. If you can't get the consent in the beginning, go ahead and apply and try to get it in the interim. But there still isn't anything that addresses what the agency must do for applying for so-called savings clause release. What does the agency have to do to get the secretary to make a finding pursuant to Section 2 of the executive order that failing to settle the refugees would be inconsistent with the policies and strategies? What does a resettlement agency do with that? There's nothing in the notice that tells you what to do. Well, Your Honor, what they do is they apply consistent with the notice with all of their information and propose those locations. And I will point out, at JA 55, the notice says very clearly that the State Department will evaluate, quote, all applications. You know, at JA 62, it says, you know, after discussing the fact that consents can be provided on a rolling basis, it says to resettlement agencies to document consents or their unavailability and that no placement will occur in places lacking the documentation. But that's really all it says. And so to the extent that this court thinks that... Well, that's not all it says at all, counsel. It says at the beginning of that paragraph that they'll take into account the consents to the maximum extent permitted by law. And I have to say, it's not... I don't want to... Let me be... I don't want to charge you with what's going on in other cases, but you're sort of catching me on a bad day because I've had a long series of cases now where the government comes into court and tries to pretend that these executive orders don't mean anything. They're just... We're just spinning our wheels. We're just making noise. And don't worry, none of this actually means what it seems to mean. And I sort of feel like either, you know, either defend this executive order, which I understand has a savings clause consistent with law and an exception that has not been operationalized by the agency and on its face doesn't seem to mean anything. But the point of it is to require consent. And the agency is clear that it will consider the absence of consent to the fullest extent permitted by law. So I feel like having a whole argument about whether an executive order that did something different and said, we just want to, like, really confirm that everyone's having good consultations and then we'll just throw that into the mix with everything else. I mean, we can talk all day about whether that executive order would be legal or not, but I don't... I feel like we're not talking about the actual executive order we have in front of us. Well, so just a couple of responses to that, Sharon. Number one, you know, to the extent the court thinks that the notice hasn't, you know, implemented that savings clause of the order appropriately, that might be a basis to enjoying the notice but not the order. And just going back to the order then, you know, it just simply does not set up the veto that the district court thought it did. And I want to remind the court that that is really what this case is about. It's not about ultimately what the State Department does with the funding. That is something that plaintiffs could challenge if their funding got denied through a subsequent action under the APA. The question here is merely gathering consent, merely asking states and localities if they say yes or no, is that a veto over the federal resettlement decisions? And it's not set up like that, and in practice it doesn't operate like that. So I agree, the executive order does something. It does make clear that gathering those consents and taking those views is serious, but apart from that, Your Honor, it's really up to the State Department to finally make that decision, and that is something that hasn't yet happened. I think I have to reserve the balance of my time for rebuttal unless the court has additional questions. Well, you can answer questions if you get the time. I have one I want to ask you. Are these issues being litigated in other courts around the country? Your Honor, this is the only challenge. The only challenge is in Maryland and now in the Fourth Circuit. This is the only challenge I'm aware of, Your Honor, yes. All right, then Judge, they're saying they ruled against you. That's correct. They issued an injunction. Did they issue a stay order? I believe it was just a preliminary injunction, Your Honor. So it's been a fact? Yes, yes. The State Department has not implemented the requirements of the notice. They've just continued to operate under previous cooperation agreements with the agency. It's possible that the election next week could have an impact on this litigation. Hard to say, Your Honor. But right now the status quo has been maintained. I understand. Other questions? Yes, Mr. Vismondela, I have one question. I'm trying to think about the practical applications of this and how it's going to play out. And there's a requirement that the executive of the locality consent, okay? So let's take a classic executive situation in Fairfax County, Virginia, where the county executive, okay, would say he consents. But the Board of Supervisors of Fairfax County is the body that appoints the county executive and they override his consent. They say, no, you can't consent. You're subject to service at our pleasure. And we're dismissing you because you're exceeding your authority. We make those decisions. So then the county executive is thrown out of office. What is the validity of the consent, then, that the county executive has tendered to the resettlement agency? Your Honor, just in that specific circumstance, it's hard to offer a specific view, but I would point the court to guidance that the agency provided. After issuing the notice, that makes clear to the resettlement agencies that to the extent there's confusion over who can give consent or what locality qualifies or what executive qualifies, that they can actually work with PRM and the State Department to try to sort out that confusion. Yeah, but that's saying, you know, is there a county or is it a city? That's talking about identifying the locality, the proper locality. It's not talking about when the locality's legislative body overrules the executive of the locality who has appointed the executive in the first place. And I bring up this example because it just shows you the total confusion and chaos that nobody thought this through. It's just like an edict without consequence. It's so impractical when you think about operating on the ground. I'm going to drop that. Certainly, and I would go back to the point that this is not something that sets up, you know, a hard and fast rule on where refugees can go to the extent that there is confusion or to the extent that consent cannot be provided because there's a lack of authority. I mean, this is just one piece of the puzzle. It doesn't destroy the other consultation conversations that happen under the Refugee Act. And the other thing that I would say here is that, you know, that real question about what happens on the ground really says very little about what the district court held with respect to this requirement, which is that just asking for consent creates a veto. As long as this court says that it doesn't set up a veto, the court has to vacate the preliminary injunction because that was the legal basis under which the district court relied. Counsel, this is Judge Harris. I have a – I'm sorry to keep you. I just have a quick question on the APA claim. And I understand your argument that our APA review should be limited to the funding notices sort of discretionary component because, you know, we can't review the executive order itself under the APA. And I will assume for now that that is right. And the executive order leads it to the agency to decide how these consents will be obtained and who will have to get the consents, whether that will be the government itself, the federal government reaching out for consents or not. So is there some place in the record that explains why the agency decided that it would put that burden on the resettlement agencies? Your Honor, I think we – there is a declaration in the record that the district court did not strike, and that's at JA – starts at JA 208, Declaration of Andrew Rupert. But in summary form, the reason it made sense to, you know, ask resettlement agencies to be the ones to collect those consents is because, number one, they're actually the ones proposing locations, so they know where they hope refugees can be placed. And number two, as even plaintiffs will acknowledge, they have extensive community contacts that the State Department really doesn't have in those local areas. And so they have the contacts already to start to – Okay, but Ms. Mundell, aren't you – Judge Keenan here – aren't you setting up a conflict with the statute, though, by putting this burden on the resettlement agencies? Because the statute, Section 1522B, talks about the intent of Congress in providing this assistance is that social service funds should be focused on employment-related services, English as a second language, case management services. They're not talking about having the resettlement agencies have to dissipate the funds they get, which is what, $2,175 per refugee, on this consent process when Congress itself wants to concentrate the money on employment-related services, English as a second language, and other specific things that have nothing to do with consent? Your Honor, so I think that the funding that these agencies get through this grant process is very different from their otherwise overall operating budget because the funding is just for initial resettlement. And I would point, Your Honor, back to Section 1522, Section C-2, little Roman numeral, which actually does envision exactly a process where representatives, quote, of local affiliates of volunteer agencies meet regularly, not less often than quarterly, with representatives of state and local governments. To plan and coordinate. To plan and coordinate, not to obtain consent as a matter of law. Your Honor, it is true that the statute does not refer to the word consent, but this is exactly the circumstance that we're in where we have these conversations and consultation conversations happening between these resettlement agencies, states, and localities, where they discuss the plan for resettlement. And so it's not inconsistent with the Refugee Act. If the Refugee Act is silent regarding consent, to then allow this to require the refugee resettlement agencies to initiate those conversations and ask for those consents. Is your position that coordinate means consent? No, Your Honor. Consent means a lot of things. Your Honor, I think the consultation meetings, certainly in the past, have allowed states to, you know, voice their concerns and to say whether or not they would be willing to accept refugees. So I don't think there's anything special about having a consent requirement happen in those consultations. That's something I think the Act envisions. It's just that this consent requirement provides a very clear mechanism for those views to be shared in writing at a very early stage in the process when all this planning and proposals are happening, instead of farther down the line. Counsel, this is Judge Harris again. I just want to make sure I'm clear on this. The declaration you pointed me to for the part where the agency considered, you know, the agency's explanation for why it imposed this obligation on the resettlement agencies, that's a litigation declaration, right? That's correct. So there's nothing in there. Go ahead. Oh, the only other thing I would say, which I think is maybe getting at your question, is that in the notice of funding at JA-62, the State Department says that PRM and ORR, quote, seek strong environments to support resettlement and speeding integration in regard to state and local consent to refugee resettlement activity as important evidence of such strength. So to the extent the court thinks that there's not enough explanation for why resettlement agencies were chosen to initiate those contacts, you know, again, that might be a ground to enjoin the notice, certainly not a ground to enjoin the order. Okay. But so in terms of something in the actual administrative record that would explain that choice, it's that sentence you just read me on page 62. That's right. As far as, you know, why resettlement agencies, you know, as opposed to some other organizations, correct. Your Honor, unless there are any, unless there's any other questions we would ask that this court vacate the three parties that are involved in this case instead of nationwide relief. Thank you, Ms. Dundell. And you, Dundell, I'm sorry I mispronounced your name. And you've saved some rebuttal time. We're going to hear again from you. Mr. Cox. Yes, Your Honor. Good afternoon and may it please the courts. My name is Justin Cox. Thank you. It's good to be here, Your Honor. My name is Justin Cox. I'm with the International Refugee Assistance Project. I represent the plaintiffs of Pelley's highest church world service and Lutheran Immigration and Refugee Service. Your Honor, the district court did not abuse its discretion in holding that the plaintiffs are likely to succeed on the merits of their claims and that a preliminary injunction was warranted to avoid further irreparable injury and to restore the status quo as it has existed for some 40 years while the rest of this case plays out. Just to pick up on a few of the questions directed to Ms. Mundell, I want to start with consultation and consent. Consultation, which is a word the statute does use, is of course not consent. Consultation is a conversation. It's a dialogue. It's not a permission slip. If Congress wanted to require consent or to make consent a relevant consideration in this statutory scheme, it would have said so. But it didn't. And it didn't for good reason. Congress did, of course, recognize that states and localities can be valuable partners in the effective resettlement of refugees, but they were even clearer that they can't stand in the way of refugee resettlement and that their preferences as to refugees being resettled within their borders is just not a relevant consideration under the statutory scheme. And we know, I also wanted to touch on the fact that we know right now that just as the executive order directs, refugee resettlement under the order will in fact be conditioned on the consent of both the state and a county official. And we know that most clearly from the declaration that Ms. Mundell referenced in her argument, the VBREC declaration, Mr. VBREC was in charge of implementing the executive order. And at the end of his declaration, paragraphs 11, excuse me, 10, 11, and 13, he explains in no uncertain terms that consent is required for the resettlement agencies to be able to resettle refugees in any particular jurisdiction. Excuse me, counsel, what page are you on in the JA? Yes, your honor. So on JA 212 and 213, so in paragraph 10 on JA 212, he describes, Mr. VBREC describes consent as a requirement. And in paragraph 11, he makes quite clear that the role that consent is playing in this process. He states that if a resettlement agency has sought consent by January 21st when the applications to the funding notice were due, but the consent hasn't been granted yet, they can still submit a proposal so long as they receive consent before the beginning of the funding period, which was to begin on June 1st. He says as well that if, in the last sentence in paragraph 11, he states that PRM plans to maintain flexibility and to actually, if consent is withdrawn in the middle of a year, they will apparently adjust the placement plans solely on that basis. This is demonstrating quite plainly that the role that consent is playing in this process. Now I understand why Ms. Lundell on appeal wants to try to put some distance between the executive order and the funding notice and to suggest that perhaps the funding notice was not in accordance with the executive order, but that's one that's not an argument that was ever made to the district court and so can't be a basis for holding that the district court abused its discretion. But it's also in conflict with the government's own briefing. So in their opening brief, they argue on page 21 that the agency is merely directly implementing the requirements of the executive order. On their reply on page eight, they say that the agency represented the agency is simply carrying out the unambiguous import of the directives of the president. And so, and we don't disagree. We have never argued, never suggested that the funding notice is in any way inconsistent with the executive order. To the contrary, we believe that as the government's reply on page nine states, Mr. executive order required. And the issue is your honors that when Congress enacted the refugee acts, they, they carefully considered the role that states and localities can play in this resettlement program. And they expressly decided not to give them the authority that the executive order attempts to do. So for example, you can see this all over the statutory scheme. For example, when a state decides that it wants to withdraw entirely from the refugee resettlement program, what's nothing to do with the administration or provision of services to refugees and their borders. There's a congressional, there's a, excuse me, a statutory provision that authorizes the federal agencies to designate a private entity to essentially step in the shoes of the state such that refugee resettlement continues uninterrupted in that, within that state. We saw this, you know, most recently in Texas and in 2015 sued to block the resettlement of Syrian Muslim refugees within its borders. You know, that case was dismissed in June of 2016. And in response, a couple months later, governor Abbott announced that he would withdraw Texas from the, from the refugee resettlement program. And so the federal government arranged for another entity to step in and refugees have continued to be resettled in Texas, notwithstanding governor Abbott's clear objections, just as Congress intended. And judge Posner made this same point in the seventh circuit case, the Exodus case, when regarding then governor Mike Pence order to Indiana state official that they deny services to refugees from Syria. And I, you know, the executive order states in section one, that the, that some states and localities desire a more defined role. But the fact of the matter is that Congress decided to give them precisely the role they have. This isn't a design flaw. This is, this is what Congress intended. And the, and there's no room here for the president to add additional requirements or certainly to, to undermine that congressional decision. Congress was- This is judge Keenan. I wanted to ask you, in order to prevail, in order for you to prevail today, do we have to agree with the district court that this is a veto power that the executive order grants states and localities, or is there an alternative path to upholding the district court? And if so, what is it? No, your honor, you do not have to agree with that. With that conclusion to affirm, cause there are any number of other, there are a number of conflicts with the statutory scheme that don't depend on that conclusion. One, for example, is that the Congress stated explicitly in the statute that it's resettlement provisions are to be uniform and comprehensive. And the executive order in section one is plain that it is not enforcing the statutory scheme. Instead, it says that some states and localities think that the statutory scheme is in consultation scheme is insufficient, that they don't have a sufficiently defined role. And so he's going to order this sort of additional consent requirement. But Congress said that what it was doing was comprehensive and there's no dispute either. Even the government does not dispute that. In fact, it's part of their position that, you know, if a particular state doesn't consent that at a minimum, it will, that lack of consent will be taken into account. But that means that each state is going to be evaluated differently, simply based on a non-statutory factor. But what Congress wanted, and this is plain in 1522, is it wants the federal needs of refugees. And that's, and it made explicit the factors that the agencies are to consider and made sure that the states and localities have the opportunity to provide input. But ultimately, the decision is what's in the best interest of refugees. I think as well, the executive orders, the other stated rationale that states and localities have are in the best position to know their own, know the capacity they have for refugee resettlement. That also conflicts with the statutory scheme because 1522A3 assigns that exact same responsibility to the federal agencies. They're required to ascertain what the state and local capacity is across the equitable distribution of refugees around the country. And more importantly, ensure that where refugees are placed, they are most likely to thrive, to integrate into their new home. And I think the other part of this too, Your Honor, that even if you don't agree that the consent requirement is an absolute veto, it also undermines the as I mentioned before, that consultation is not consent. And really this, if you were to construe consultation to mean consent, that would have enormous consequences given how common the consultation requirement is in the law and environmental statutes and in many other contexts. And the case law is clear in that regard that consultation does not mean consent. You don't have to get permission with someone who you're merely required to consult with. I also wanted to touch briefly on Judge Keenan's point about how the executive order disrupts the state-local balance that Congress struck. And I agree completely it creates any number of practical difficulties. As someone who's sitting in Atlanta right now, I'll add further complications to the hypothetical. There are 29 counties in the Atlanta metro area. They don't have executives. We don't have county executives in Georgia. There's a county manager, but that person's not elected. That person is merely hired. And so there are lots of implementation issues. It's plain that no one thought through how this could actually work on the ground. The other issues that we wanted to touch on very briefly, in terms of the arbitrary and capricious claim, although the government's argument is that it was merely implementing the executive order, there were a number of discretionary decisions that it made. The executive order required them to devise a process to get the consent of a locality, but it didn't say what kind of locality. And the agency apparently decided that it should be counties, but they've never explained. Even on appeal, they've yet to explain why they chose counties instead of municipalities. And even though the record reveals, and this is at JA 106, paragraph 75, the record reveals that the agency did consider getting the consent from cities and mayors. An earlier version of the funding notice actually listed cities and mayors as entities from which consent could be obtained, but then they amended it about a week later to remove that. So they plainly considered it, but they've never explained why they chose counties instead of municipalities. And then even the decisions that they tried to explain post-talk with the litigation affidavit, the VPRAC declaration, it does not explain most of the relevant decisions. Even, for example, the unaccompanied refugees minor program, which the unaccompanied refugee minors program brings, as the name suggests, unaccompanied refugee children to the country. And that is the one part of the refugee program that is optional with states and localities. They have to opt into the unaccompanied refugee minor program. And it was pointed out to the agency, this is JA 202, it was pointed out before they issued the funding notice that state and local consent is already granted within the URM program. And so it doesn't make any sense to require this additional consent. The VPRAC declaration, although it claims that the agency took into account the unaccompanied refugees minor program, it doesn't actually address the issue that was brought to the agency's attention as illustrated in JA 202. Counsel, this is Judge Harris. I just have a quick question about the arbitrary and capricious in the claim and the failure to explain some of these decisions. Would the right remedy for that be in joining just the funding notice and not the executive order? How does that get you to an injunction against the executive order? I don't think it does, Your Honor. I think to join the executive order, you have to find that the executive order contravened the statute. Our APA claim is something of a backup, to be clear. I think our plain preference is that the court join or affirm the injunction of the executive order itself. And, you know, in terms of the scope of the injunction, which Ms. Do you all litigate the scope of the injunction at all? Yes, Your Honor. Pardon? Yes, Your Honor, we did. Have you asked for a nationwide injunction? Well, we asked that the executive order and the funding notice be enjoined in their entirety. We didn't ask for a geographic-based injunction because it doesn't really make sense in this context because of the nine resettlement agencies, their networks overlap geographically. It wasn't based on geography. It was based on the fact that our clients need that full injunction in order to be protected from the executive order. And the record is quite strong on this. But the biggest reason why our clients need it has to do with secondary migration and the fact that in some places the networks overlap and in some places they don't. So take Alabama, for example. Alabama has not consented to the resettlement of refugees. There's only one resettlement agency that resettles in Alabama, and that's Catholic Charities, which is a non-party. So if the injunction is limited to just our clients, that would mean that And so if there is a refugee who has a family member who's already in Alabama or a preexisting social tie, that would ordinarily result in that refugee being resettled in Alabama. Instead, they're going to get resettled somewhere else. And then shortly after they arrive, they will pick up and move to Alabama because that's where their network is, that's where their family is. And the record is undisputed that that phenomenon was known as secondary migration. It hurts everyone. It would hurt our clients, even though they initially resettled the refugees. It would waste all of the investments in getting an apartment for them and helping them access other services. And so regardless of the arguments about whether or not it was appropriate to extend the injunction to non-parties, the fact of the matter is our clients need an injunction of the executive order and the funding notice in their entireties just to protect themselves. And I think the other point to make on this is that in the Refugee Act itself says that its provisions are to be uniform and comprehensive. And as the amicus brief of the non-party resettlement agencies notes, the Supreme Court has held that a court, when exercising its equitable authority, cannot ignore the judgment of Congress if it's deliberately expressed in legislation. And that's the Oakland Cannabis Buyers Co-op case. And so I think the district court was, in addition to, yeah, the district court is well within its discretion and in fashion, the preliminary injunction that it did. But it was also narrower than, it wasn't particularly broad. It didn't try to micromanage the agency's work. Otherwise, it was explicit that the agency could issue a new funding notice at any time. And so we think at a bare minimum, you know, the court did not abuse its discretion. And I think more, as my time is about to expire, I just wanted to remind you. Before the judge framed the injunction, did the parties negotiate over the scope of the injunction or anything like that? Or did the court have a conference or a hearing on the scope of the injunction? Yeah, during argument, Your Honor, and this is in the joint appendix, there was discussion of the scope of the injunction. We explained that we didn't think it was possible to have an injunction that was only limited to our clients, including because this is, in this context, where you have a funding notice, where the agencies, the federal agencies are going to decide which of the settlement agencies to fund. And we pointed out, like, how do you even have a practical or comprehensible... May I finish the question, Your Honors? You answer this question, and any others you get, you answer. Thank you, Your Honor. Yes, this was discussed at argument before the district court. The district court asked the government, how could you practically administer this program with an injunction that's limited to these three plaintiffs, given geographic overlap and the fact that you're supposed to be evaluating applications from all of them under the same criteria. The government conceded that it will create problems, practical problems. It declined to say how those problems could be addressed or would be addressed, and, you know, just rested on their arguments, just sort of the principle that a nationwide injunction is, per se, improper. I think the discussion of that started around JA396, Your Honor. Thank you. Other questions? No, thank you. Okay. Thank you very much, Ms. Cox. Thank you, Your Honors. Ms. McDowell? Yes, Your Honor. Thank you. I'd like to make just a few points in rebuttal. I'd like to start with Judge Keenan's question of opposing counsel, where she asked if this court finds that the order and the notice don't create a non-uniform placement of refugees, but that is always the case.  So that's not a question of whether or not we support the injunction. And just addressing those three points that Mr. Cox made in response. You know, the first one is that he said that resettlement provisions under this act are supposed to be uniform and comprehensive. But this is a uniform process. Every state and locality's consent or non-consent is taken into account. The fact that that may lead down the line, that more refugees going to one area or another may create a non-uniform placement of refugees, but that is always the case. Some states always have more refugees than others. So that's not a question of whether the policies themselves aren't uniform or comprehensive. Number two, he said that we have to look at 1522A3, which is the federal requirement to ascertain capacities, and that that's not really directed to refugee agencies. But, of course, the first response to that is that that statutory section doesn't foreclose resettlement agencies from being involved in this process of gathering consent. In any event, that is only an argument that's directed to the notice. It's not an argument for enjoining the executive order. And then third, he pointed out that this requirement would just destroy the consultation process altogether. But we would resist the notion that, as Mr. Cox characterizes it, that this is some sort of permission requirement that, again, overrides the secretary's decision-making. Because once the court recognizes that this is not a veto, it's not as if once the state says no, refugees can't go, then it just becomes yet another factor, just like the consultation process that already occurred, that the State Department takes into account with the other factors enumerated in Section 1522 in determining placement. Again, I do want to make sure I fully understand your argument. And maybe the best way to think about it is, like, I can imagine sort of three different regimes. Well, hang on. The one we have now, the one we had before the executive order, that's one. Another one would be what I think you are saying this executive order does, which is we're going to seek consent, and then we will just consider that along with all of the other statutory factors. It's just one more additional factor, and that's all. And then there's what I think, let me just say what I see when I look at the There is this exception or savings clause, which the executive order itself says is a limited exception. And just imagine hypothetically, it doesn't say that you will now look at the absence of consent as just one among every other factor equally weighted. It says that to the maximum extent possible, you'll not resettle people absent consent, subject to this limited exception, undefined in the funding notice, not operationalized anywhere, and which on its face says the exception will apply only when failing to resettle a refugee would be inconsistent with law. You're arguing for number two, that no, no, that's not what the order says. It says that you'll just consider it along with all other factors. If I think hypothetically, it's actually the third one I described. There's this limited exception that on its face applies only when you can show that not relocating someone to a particular place would be inconsistent with the law. The law requires that they be located to that place and that place only. Where are we then? Is that a veto power or no? Or would you say that's still not a veto power? If I think that that's all the exception does, is the government right anyway? Because that's still not a veto power? That's what I'm trying to get at. Yes, Your Honor. We would still say that that's not a veto, specifically because, again, the discretion really is in the prosecutor's hands. And so as a result, even if you read that provision narrowly, the district court still gets it wrong here in adjoining the order and the funding notice. Okay. Ms. Montel, this is Judge Keenan. What happens, in your view, if every state and locality withholds consent? Why doesn't that create a problem undermining the act's purpose of resettling refugees? Nobody will take them. I mean, your whole argument seems to assume that somebody will take them. But what if nobody does? Where are we left? So, Your Honor, I mean, again, we would resist this notion that when a state says no, that refugees can't be placed there. It's really just communicating their recommendation or their preference in a clear manner. And we can talk about the real numbers on the ground here because, in fact, in the short while that this notice and executive order were up and running, plaintiffs were able to gather consents from 42 out of 43 states and over 100 localities. Right, but I'm asking you about the hypothetical because we've got to consider exactly how far this could go if we approve it. And what happens if every state and jurisdiction withholds consent? What happens to the act's purpose of resettling refugees? Does it just go by the boards? I mean, what happens? Well, Your Honor, again, even if every state and locality in the country said we're not willing to accept refugees, this refugee resettlement process continues under the Refugee Act because, of course, not taking any refugees when they have been approved and when there are places with employment opportunities and housing, that would be inconsistent with the Refugee Act. And that is exactly what the executive order says. Failing to resettle refugees in that jurisdiction would be inconsistent with the act or otherwise applicable law. So you're saying, then, the consent requirement would be nullified by the executive order? Well, that's exactly what that savings clause does. Consent only goes so far as it doesn't run up into any problems with existing law or if it's inconsistent with those other factors that are mentioned in the act. And so if that's the case, then, of course, that's going to affect the weighing of that factor. But, again, it's not a veto problem. It's just a relative weight of these consents or non-consents in those other factors. That is something that's committed to the discretion later down the line. And at this stage, the question is really just... So you're saying the savings clause is a matter of law to nullify the consent requirement? I guess I'm not sure if I understand the court's question, but I think the answer to your question, Your Honor, is just this savings clause in this order makes clear that the secretary's decision-making process is preserved under the act. Okay, but could you answer the question, can the savings clause nullify the consent requirement? You seem to be saying, yes, it can. I'm not sure what the court's asking with respect to nullify. I mean, if placing a refugee in a particular area that hasn't consented would accord with the act, then the consent probably played very little role in the process. I don't know if it's something that nullifies the requirement. It's not a veto, so it's not something that really gets nullified. Right. Well, this seems to be your reasoning, and I guess I should let you know what I'm referring to here. The city and county of San Francisco case, you know, 2018 out of the Ninth Circuit, they seem to be rejecting the analysis that you've given, and talk about savings clauses have to be read in their context. And they cannot be given effect when the court, by rescuing the constitutionality of the measure, would override clear and specific language. It seems to me that there's just an internal conflict in your position that is analogous to the one pointed out by the Ninth Circuit in city and county of San Francisco, 897 Federal 3rd 1225. I think I see what you're saying, Your Honor. And so if I can just explain, Section 2B here really just says that, you know, there's got to be a mechanism to gather consents and non-consents. And then it says should. It doesn't say shall. It says should. These refugees should not be resettled in those localities that don't consent, unless failing to do so would be inconsistent with law. And that, I don't think, creates the sort of conflict that the San Francisco case was really looking at. That is something that speaks to a very real consideration by the Secretary of State, that once it has these consents or these non-consents at hand, what it does with that with respect to the other factors. There's really no nullifying or conflict there. It's really communicating that the Secretary retains the discretion to make that decision holistically. Also, I guess you would so much rather be up here defending an executive order that said they should not be relocated there unless the Secretary, considering all factors in the statute, thought that that was best, to relocate them there. But that is so not what this executive order says. And people draft these things really carefully. They did not say, unless it would be consistent with the statute, to relocate them over the jurisdiction's non-consent. And I still, except for, I actually, we did sort of get to an answer toward the end, that it might be inconsistent with law not to resettle a particular refugee in a particular place if everybody had said no, and so there was nowhere else to put them. But short of that, I mean, people choose the language in executive orders with great care, and they did not write it the way you are defending it. And so I just keep getting caught in this, you know, would that it were written the way you are defending it, because then I think you would have a much easier case. But that's just not what it says. Well, Your Honor, and I apologize if I'm being imprecise or if I'm sort of, you know, completing the language, but I think, you know, the court's question is really getting into the relative weight of this factor among the others. It's not a question of whether just having the consent is a veto, right? And that's really what's going on here, because if the consent, if just gathering the consent were all you needed, there would be no reason to include that savings provision in the executive order at all, because then the executive order would have to stand for the proposition that once you have the consent, that's all you get. Really, what this executive order does in Section 2B is to say that, you know, after you get these consents and if you're going to resettle a refugee in a place that hasn't consented, you have to look at the factors. And if failing to put them in that. You keep saying it really, we will just have to agree to disagree about this, but I'm sitting here looking at it, and it just doesn't say that. It says you have to, before you decide you're not going to send a refugee to the locality that didn't consent, you have to make sure that not sending them to that place would not be inconsistent with the factors. And I just don't see how sending them somewhere else would be inconsistent with the factors. I'm still finding this to be a null set. And I know you want to push that down to sort of how this will play out in operation. But if it's a null set, then there's sort of a problem on the face of the order, I think. That is my concern. And so, Your Honor, the only thing that I was going to say just briefly before that was that, you know, the order clearly does direct the secretary to look at those factors. It references the factors specifically. So, of course, the secretary has to look at them. Now, when the language says failing to resettle refugees within that state or locality would be inconsistent with those factors, it plainly contemplates a process where the secretary considers those factors and then thinks about whether not putting a refugee in that location is inconsistent with those factors. And that is enough to defeat this idea that it is a veto, because that shows that the secretary of state retains this discretion to determine whether it's inconsistent. And there may well be a number of reasons why it could be inconsistent, thinking about secondary migration, the holistic factor, and I'm quoting the language here, subsection C3, big Roman numeral three, the likelihood of refugees placed in the area becoming self-sufficient. This is a holistic, you know, process that is not at a granular level, unlike I think what Mr. Cox said. I promise, I know, I apologize to everybody involved, because if I could understand this, it would be helpful. So, okay, that factor is the likelihood that they would be self-sufficient. So the secretary would say Atlanta is self-sufficient, but I'm looking at Atlanta and I think they would likely be self-sufficient in Atlanta. But that doesn't mean that it would be inconsistent with that factor to resettle them in, say, New York, if they would also be self-sufficient in New York. And so that's why I'm having, like, I don't see how looking at a factor like that, you could ever find it would be, just because it would work in Atlanta, doesn't mean it would be inconsistent with that factor to put them somewhere else. And, Your Honor, on the ground, that, so that might be the case in, you know, certain circumstances, but of course there's a very, you know, real likelihood on the other end that it's not. I mean, likelihood is not an on-off switch. Likelihood already implies some type of degree of likelihood. And so, you know, again, if Atlanta is a place where the refugee has, you know, numerous contacts, there's plenty of employment opportunities, you know, it may be the case that that really nudges that likelihood of success, you know, much greater. And so it would be inconsistent in that circumstance to perhaps place them, you know, somewhere else. And I would say, by the way, Your Honor, that, you know, there have been times that the State Department has been told by states and localities that they just really have grave concerns about resettlement in a particular year and that they don't think that they can support it. And the State Department has never, only on that basis, determined that placement should or shouldn't occur in that location. So this is something that the State Department is equipped to consider. And so when we're thinking about what is or isn't inconsistent, I mean, this just really gets into the Secretary of State's discretion. It's really not a question of whether just asking for those consents automatically creates a veto. Because if there's any chance that it doesn't, then plaintiffs haven't established their likelihood of success to support this injunction. Thank you. Sorry. Ms. Mundell, we appreciate your work in this case and your fine argument. And Mr. Cox, you've both done very well. We very much appreciate it. And if we were in Richmond, we would at this time leave the bench and come down and shake hands with each of you and congratulate you on the job that you've done. That's what we'll have to do in these circumstances. Madam Clerk, we'll take the case under advisement and the court will adjourn until tomorrow. Yes, sir. This honorable court stands adjourned until tomorrow. God save the United States and this honorable court.
judges: Robert B. King, Barbara Milano Keenan, Pamela A. Harris